1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA
                       WESTERN DIVISION
3

4

5    MICHAEL WILLIAMSON, et al.,      )
                                      )
6              Plaintiff,             )
                                      )
7         vs.                         )   No. CV11-04994-GAF(SHx)
                                      )
8    RECOVERY LIMITED                 )
     PARTNERSHIP, et al.,             )   July 11, 2011
9                                     )   (9:57 a.m. to 11:14 a.m.)
               Defendants.            )
10   _____ )

11

12

13

                       DISCOVERY MOTION
14        BEFORE THE HONORABLE STEPHEN J. HILLMAN
             UNITED STATES MAGISTRATE JUDGE
15

16
     APPEARANCES:                 See Next Page
17
     COURT REPORTER:              Recorded, Court Smart
18
     COURTROOM CLERK:             Sandra L. Butler
19
     TRANSCRIBER:                 Nancy Staack
20                                Stellar Group Transcription Services
                                  P. O. Box 6554
21                                Altadena, CA  91003
                                  (626-737-1683)
22

23

24

25   Proceedings recorded by electronic sound recording.
     Transcript produced by transcription service.

1

2     APPEARANCES:

3

4     FOR PLAINTIFF:

5         HOLLAND & KNIGHT
          BY:  MICHAEL J. FREVOLA, ESQ.
6         31 West 52nd Street
          New York, NY 10019
7         212-513-3516

8             - and -

9         HOLLAND & KNIGHT
          BY:  VITO ANTHONY COSTANZO, ESQ.
10            FRANCO TENERELLI, ESQ.
          400 S. Hope Street, 8th Floor
11        Los Angeles, CA  90071
          213-896-2400
12

13

      FOR  RESPONDENTS:
14
          RUTAN & TUCKER
15        BY:  JEFFREY B. FOHRER, ESQ.
               RICHARD K. HOWELL, ESQ.
16        611 Anton Blvd., Suite 1400
          Costa Mesa, CA  92626
17        714-641-5100

18

19

20

21

22

23

24

25

1     LOS ANGELES, CALIFORNIA; MONDAY, JULY 11, 2011

2           10:00 A.M.

3

4     THE CLERK:  Calling case No. CV11-4994, Michael Williamson versus

5 Recovery Limited Partnership.  Counsel, please enter your appearance for the

6 record.

7     MR. FREVOLA:  Michael J. Frevola from Holland Knight, New York,

8 your Honor.

9     MR. COSTANZO:  Good morning, your Honor.  Vito Costanzo from

10 Holland & Knight here in Los Angeles.

11     MR. TENERELLI:  Good morning, your Honor.  Franco Tenerelli from

12 Holland & Knight in Los Angeles.

13     MR. HOWELL:  Good morning, your Honor.  Richard Howell on behalf of

14 the respondent.

15     MR. FOHRER:  Good morning, your Honor.  Jeff Fohrer of Rutan &

16 Zuker on behalf of Respondents.

17     THE COURT:  Good morning to you all.  This motion is a real treasure.

18 The first question is why weren't the defendants served with any of the motion

19 papers?

20     MR. FREVOLA:  Your Honor that was, I think, a certificate of service.  It

21 may have accidentally been incorrect.  We did actually provide copies of those

22 motions papers to the defendants.  They did not appear.

23     THE COURT:  And opposition papers were served on the defendants

24 also?

25     MR. HOWELL:  I do not know.  I know that I forwarded to one of the

1    attorneys for the defendants the most recent reply.  But --

2              THE COURT:  Everyone agrees they're aware of these proceedings?

3              MR. FREVOLA:  Your Honor, as recently as June 13th, we had a

4    telephone conference with Judge Sargus -- I think we cited it in our papers -- and we

5    talk about these things.

6              THE COURT:  I'll get to that in a minute.  But in terms of this actual

7    motion, I want to make sure they had notice.

8              MR. FREVOLA:  Yes, your Honor.  On June 13th we were talking about

9    how we were actually filing it and we were sending papers that day to opposing

10   counsel.

11             THE COURT:  All right.  My next question is there was -- this is Exhibit 1

12   to the Szoloski declaration.  The plaintiff's motion for order concerning trial

13   depositions, which was filed in December of last year.  And I'm wondering -- I guess

14   there wasn't a formal ruling on that or we wouldn't even be here.

15             MR. FREVOLA:  Well, your Honor.  There was a -- the Court authorized

16   the taking of them in a telephone conference, and the defendants didn't oppose the

17   taking of these subpoenas for the purpose we were seeking to take them, and so

18   there wasn't any specific memorialization.

19                   And what we've actually done, your Honor, is we've actually

20   asked Judge Sargus last week -- we were having a telephone conference on several

21   things, and we put the issue in front of  him in regards to the issues of the

22   subpoenas, just to have a look at them.  Because we told him that there was

23   resistance happening out here in Los Angeles, and that if he says, listen, I'm fine with

24   all of the information that's being done out there, I would think, your Honor, that it

25   would give you some sort of comfort.  Some of the cases that are cited by the other

1    side with regards to --

2                THE COURT:  This was a conference last week?

3                MR. FREVOLA:  No, your Honor.

4                THE COURT:  The June conference.

5                MR. FREVOLA:  No.  We asked Judge Sargus last week for a telephone

6    conference as soon as we could get one, based on several topics.  And one of the

7    topics we raised was, we put in the subpoenas that we served out here and said

8    we're getting resistance in terms of relevance, scope of the questions,   This issue of

9    trial versus discovery, subpoenas.  All those things.  And with the hope that Judge

10   Sargus says, "Listen, I've authorized these things as they are," which even in the

11   cases that have been cited by the defendants with regards to not transferring, the

12   term "remit" in Rule 45 seems to be interpreted around the country as if the trial court

13   says I want this taken, or I'm okay with this being taken.  It's something that the

14   ancillary court should take into consideration when deciding the application.

15                So we're trying to give your Honor a little more information, a

16   little more guidance about the trial court because we think that Judge Sargus is

17   totally fine with these, and we want to try to give you as much information as

18   possible.

19                THE COURT:  Well, let me tell you, having been assured that the

20   defendants are aware of this motion, and having correctly read the tea leaves that

21   the former motion in December was not formally ruled upon, I'll give you my tentative

22   thoughts, and then I'll hear.  First of all, I did consider contacting Judge Sargus

23   myself, but I don't think it's appropriate for me to do so without all counsel for all

24   parties, including defendants.  So that's not something I was comfortable doing.

25                My tentative rulings are to not transfer the entire dispute to Ohio

1     since there is no personal jurisdiction over the respondents there.  Secondly, I have

2     considered -- I guess your term is remitting, but I use bifurcating -- the issue of

3     whether the subpoenas are authorized by Judge Sargus back to him while retaining

4     jurisdiction over the actual enforcement of the subpoenas in the Central District.  But

5     I decided after going back forth, I don't think that's necessary either because I do feel

6     that Judge Sargus gave implicit, if not explicit, authorization to proceed with the

7     subpoenas as either discovery or trial subpoenas.

8              And when you look at the colloquy from the June 2011 telephone

9     conference, it's clear to me that he was well apprised of what plaintiffs were

10    attempting to do.  And, indeed, he was trying to schedule the trial date in recognition

11    of a lot of moving parts, including these depositions.  And he, Judge Sargus, says at,

12    I guess it's page 764 -- page 20 of exhibit.  He says, "After that we" -- this is him

13    talking -- "After that, we hoped that the matters in both California and Virginia start to

14    unravel in those courts."  So he certainly could have indicated some concern or

15    prohibition.

16             And the defendant's silence, both in response to these motions

17    and at the June hearing which I just quoted -- the defendant's silence, I think, speaks

18    volumes.  Clearly, they would have incentives to oppose these subpoenas, and they

19    have elected to remain out of this dispute, leaving me to conclude that they agree

20    that the subpoenas are fair game.

21             So I think that, without further ado, the subpoenas should be

22    enforced, without further delay or further litigation in Ohio.  I would never want to step

23    on the district judge's toes intentionally or unintentionally, but I think that is clearly

24    what the Court expects.  And I would further intend to overrule objections as to the

25    manner of service, timeliness over breadth and lack of specificity.  Of course,

1    respondents would still be able to serve a privileged product log when they comply

2    with the subpoenas, but I'm confident that these were approved explicitly or implicitly.

3    And to just send this back and forth between Ohio and California just seems a waste

4    of time.  So let me hear from respondents.

5            MR. HOWELL:  Thank you, your Honor.  First of all, I want to give the

6    Court just some perspective here because the reply papers, your Honor, are very,

7    very aggressive and very over the top.  And they are riddled with hearsay.  They're

8    quoting from newspaper articles that are 11 years, and they go on and on --

9            THE COURT:  Frankly, I didn't pay a lot of attention to that.

10           MR. HOWELL:  Here's what I want to stress, your Honor.  We represent

11   third parties who have no relationship, no common ownership, nothing to do with the

12   defendants in this case.  The defendants in this case, when my clients, loosely called

13   the Manley clients, came along and bought this treasure, this treasure, your Honor,

14   was underwater with liens everywhere.  We had to come in and buy out those liens.

15   The major lien, the first priority lien was owned by Christies.  They're better at valuing

16   and authenticating this better than anyone else.  Christies sold their lien to us at a

17   discount.  But the notion that this is a $50 million treasure or $100 million treasure or

18   $200 million treasure has nothing to do with this dispute.  And I want to emphasize to

19   the Court that we have nothing to do with Ohio or anything to do with the litigation

20   back there.  We bought the treasure --

21           THE COURT:  I understand that.

22           MR. HOWELL:  We bought the treasure 12 years ago, your Honor.  We

23   sold it the better part of a decade ago.  And I'm only referring to the Manley parties

24   because you really have to understand, your Honor, I'm here representing -- and it's

25   purely for economy's sake -- I'm representing two very distinct parties.  The Manley

1    parties, who purchased the treasure in an arm's length transaction from the

2    defendants the better part of more than a decade ago.  And then Manley

3    subsequently sold a portion of the treasure to my other category of client, Monaco,

4    who in then turn sold it in commerce.

5           So you've got two different layers here.  You've got the

6    defendant, the defendant selling and then the Manley party selling off a portion of it

7    to my other client, the Monaco party.  And I want you to know these subpoenas ask

8    for every single document both sets of my clients have relative to the treasure.  Any

9    document relative to the treasure over the past decade.  They ask for every single

10   document.  It is asking for stuff that absolutely no relevance to their case.  Let's talk

11   about their case --

12          THE COURT:  Well, let me say, if I stick with my tentative, I think there

13   is possibly some room for real negotiation on what should be produced, leaving aside

14   privilege and work product.  And I would encourage you, if not order you, to meet and

15   confer if I go in this direction.

16          MR. HOWELL:  I want to address relevance first, and then I'm going to

17   get to a whole myriad of other problems as to why I don't think this court can enforce

18   these subpoenas and why it's a depravation of due process to my client.

19          But I will deal with, first of all, the relevance issue, your Honor.

20   They claim to represent a group of folks who apparently helped the defendants find

21   the treasure, and they claim that they own an interest.  I think it's one half of one

22   percent of the net recovery that the defendant's had in this treasure.  And, your

23   Honor, when they briefed this motion, they briefed the motion for 30 pages, talking

24   about how they get to track the monies that the Manley parties received when they

25   sold off this treasure to folks like Monaco and others because their clients have a

1        continuing interest in those proceeds, your Honor.

2                    Your Honor, nowhere when they briefed that in the 30 pages --

3        and that's the only explanation they offer when they brought this motion, your Honor.

4        We have a continuing interest and we are entitled to track these profits because we

5        have a derivative interest in the profits.

6                    They reference the fact that in June of 2001 the Manley parties

7        initial agreement was amended with the defendants.  Your Honor, that amendment

8        cut off any continuing profit interest.  The Manley respondents paid the defendants a

9        lump sum under that amendment -- millions of dollars in consideration I might add --

10       in order to eliminate that continuing interest.  And it's without dispute that that

11       amendment was entered into and that that amendment cut off any continuing interest

12       the moving parties in this action have in the subsequent sales and revenues and

13       everything.  And yet their coming in here and their motion was, your Honor, it was not

14       candid on this issue.  They briefed the whole motion on we have a continuing interest

15       in the profit.  Here look at what the 2000 purchase agreement says and we have a

16       right to figure out what happened in the next decade.

17                   They had the amendment -- and I talked to them about this, your

18       Honor -- the amendment cut off any continuing rights.  So when you see all this talk

19       about we need to figure out what Manley sold the treasure for in 2002 and 2003 and

20       another way to remove somehow what Monaco sold it for in 2003, 2004.  It has no

21       conceivable relevance to their claim, your Honor.

22                   THE COURT:  You mean it was in 2001?

23                   MR. HOWELL:  June of 2001, your Honor.  And it cut off that continuing

24       profit interest in that amendment in redacted form, but the pertinent language is very

25       clear.  That continuing interest was liquidated.  And I told them, if you want to know

1   how much was paid as part of that liquidation at that point in time, because we

2   redacted the figures, and we redacted them five years ago when we had this dispute

3   with these folks, that that's something that we'll give you.  And what they said was,

4   no, we want to pretend like the amendment never existed and we think the

5   amendment shouldn't have been entered into, and therefore, we're claiming an

6   interest in what the treasure sold for as if the amendment had never been entered.

7   And then they throw in all this nonsense, saying that the amendment was the result

8   our breach, the amendment was the result of nefarious activities.

9               Your Honor, the amendment entered into a decade ago has

10  never been the subject of litigation proceeding.  It has never been disputed by

11  anybody.  We paid the consideration a decade ago, and yet they came into this court

12  and filed a 30-page motion, and they never informed the Court about what the

13  amendment did and did not say.  They just said we get everything notwithstanding

14  the amendment.  Now, they said we get it because we get to disregard the

15  amendment in our case.  We get to argue in our case that the amendment didn't

16  exist and we have a continuing interest, even though the defendants in this case

17  never received the money.  Their interest is based on the net recoveries received by

18  the Columbus defendants.

19              But they're in here seeking this decade's worth of discovery on

20  the basis they get to ignore the amendment and get all of our confidential sales, our

21  customer information, et cetera.  And your Honor, that's where this thing really gets

22  off track.  And I will point out, your Honor, their underlying case -- and they have

23  butchered what has happened in Ohio in terms of trying to inflame this court's

24  passion.  They lost their breach of fiduciary duty claim in Ohio.  They don't have tort

25  claims in Ohio.  They have a contract right to receive a percentage of Columbus's,

1    the folks who found the treasure, net recovery.

2              Nobody on this side of the table has a problem with them finding

3    out what was actually paid to Columbus.  What we've had a problem with, and this

4    again goes to relevance, is this cockamamie theory they've come up with that we

5    decided we're not going to accept the contract that was entered into and performed

6    without objection, litigation or anything else in June of 2001, and we're just going to

7    seek wholesale inquiry into all of your sales and all of Monaco's sales.  Your Honor, if

8    my client sold this treasure for 50 bucks or five hundred million, it does not impact

9    their claim one bit.  They had a contract claim against the Columbus parties for an

10   interest -- I think it's one half of one percent of the Columbus's party net recovery.

11   So that's the substance of what we're dealing with here.

12             But, your Honor, I don't think this Court, in the interest of due

13   process, can even get to the substance or relevance of those issues because of the

14   overwhelming substantive problems we're dealing with here.  First of all, one of my

15   clients, Monaco.  Monaco is somebody who bought from the Manley party.  They

16   have no interest in Monaco's purchases or Monaco's sales under any theory of net

17   recovery.  Even the bogus one they've advanced here in their reply papers but never

18   bother to mention in their moving papers.  Their moving papers just briefed this Court

19   on this notion this is a straight contract recovery action, we have an interest in these

20   ongoing sales, and the amendment doesn't say anything different.  So Monaco has

21   no position -- no reason for Monaco to be in here, under any theory of recovery.

22             Now, I want to talk about the deposition notices, your Honor.

23        THE COURT:  Well, this may be an unfair question, and I don't intend it to

24   be.  Why do you speculate that the defendants have no problems with these

25   subpoenas?

1    MR. HOWELL:  I'm sure the defendants would love to see these denied.  I

2    just don't know what the defendants are doing.  I really only know what's happening

3    in the Ohio action based on what I can go on Pacers and what I can go online and

4    figure out.  I don't know what's going on in Ohio.  I do know that what's going on in

5    California.  We've got no alliance with the defendants; they've got no alliance with us.

6    They are separate and distinct parties that we dealt with over a decade ago, your

7    Honor.

8            I don't know whether they are behaving like angels or behaving

9    dastardly in the Ohio litigation.  I know one thing.  That in the context of these

10   proceedings, they try to paint the Columbus parties as being dastardly, but it's got

11   nothing to do with my client.  We are not those folks, and they are trying to paint us

12   with the same brush.  And what they've done is they've come in here with this

13   misleading substantive motion as to why this stuff is relevant, and they ignore the

14   fact that in June 2001 they had no continuing interest in our sales.  It's been that way

15   for a decade and they throw all this garbage in there about, "Oh, we don't think the

16   amendment was in good faith."  Or "We think the amendment shouldn't have been

17   entered into."  They don't have those claims in Ohio, your Honor.  They lost their

18   breach of fiduciary duty claim on summary judgment.  They don't get to go back and

19   second guess that stuff.

20           But, your Honor, I want to get past that major relevance issue

21   that exists here and why we are so vehemently opposed to these subpoenas

22   because they go way beyond the scope of any conceivable relevance, and they seek

23   to get the sensitive financial information of multiple parties here.  But even beyond

24   that, your Honor, I want to go to the procedural issues here.  They purport to notice

25   the deposition of three individuals.  Dwight Manley, Inc.; Monaco Financial; and

1    California Gold Marketing Group, LLC.  Three deposition notices with a company

2    production request.  Your Honor, those are person most qualified entity depositions.

3    They don't attach any categories for examination to their subpoenas.  They don't say

4    what topics they want these depositions on.

5                        In fact, your Honor, because they know that's a major

6    substantive problem with the subpoenas here, they argue in their opposition papers,

7    or, excuse me -- in their reply papers at page 24, they say we never objected on that

8    basis and that we can't raise it now because we never objected to it.  Your Honor, if

9    you look at objection No. 3 to each one of the subpoenas the objections back in

10   January, it's now been six months, more than six months since we served those

11   objections.  Each and every one of the entity organizations objects on the basis of

12   you didn't designate topics for the deposition; therefore, no deposition can go

13   forward.  And they come in this courtroom and say in their papers that we didn't

14   object on that basis and therefore we've waived it.  They have that dead wrong.

15                        And you can look at the Frevola declaration, Exhibit 9 to the

16   Frevola declaration, objection No. 3.  If you look at any of the entities, as opposed to

17   the Dwight Manley individual deposition, which is the fourth deposition that we'll deal

18   with here, Manley individually doesn't object on that basis because an individual

19   deposition doesn't require topics, but the entity depositions all require topics, and

20   they designated none.  And that renders that motion and these subpoenas fatally

21   infirm for deposition purposes.  And again, they've misrepresented the record in their

22   reply brief to try and get around that and say we tried to get around that and say we

23   waived an argument that we never waived.

24                        Now, I want to talk about the fourth deposition subpoena that

25   we're dealing with here, your Honor.  It's the Dwight Manley individual deposition

1    subpoena.  And, again, we didn't object on the basis of failing to designate topics for

2    an individual because you don't have to designate topics for an individual.  You have

3    to do that for entities, and the three entities did that.

4              But with respect to Manley individually, they admit that Dwight

5    Manley individually was never served.  What they say they did is they went to

6    Manley's offices, and they went to the reception desk and they left it.  And the only

7    proof of service that they attach to their motion, your Honor -- they do not attach a

8    proof of service for Dwight Manley, Inc.  They do not attach a proof of service for

9    California Gold.  And the reason they didn't attach a proof of service for either of

10   those entities is because they didn't even attempt to serve either one of those

11   entities.

12             But for the Manley proof of service -- and again, you can go

13   through the record, your Honor, and these are all attached to Mr. Frevola's

14   declaration -- part of the initial moving papers which you'll see and they're all at

15   Exhibit A -- he's got three proofs of service there for the Manley parties, and the first

16   one is blank.  They didn't serve anybody for Dwight Manley, Inc.  He's got another

17   one for California Gold Marketing Group.  It's blank.  They don't have a proof of

18   service for anybody for California Gold.  The last one is for Dwight Manley

19   individually, and it says Dwight Manley individually, and it says they served Sarah

20   Watson, VP.  That's all it says.

21             THE COURT:  Well, there's the declaration of Mr. Sandoval that tends to

22   explain that.

23             MR. HOWELL:  Well, there is still no proof of service for the other

24   entities to this day, your Honor.  They got our opposition in late June.  We're now two

25   weeks later, after we briefed extensively in our opposition, and we objected initially in

1    October.  There's no proof of service for the two entities.  And they still haven't

2    corrected that.  But the only proof of service before this court says Sarah Watson,

3    VP.  You don't serve an individual by saying you serve a VP.  And here's what else

4    we know.  There is nobody names Sarah Watson that works for any of Manley --

5              THE COURT:  They agree.  You received that declaration, right?

6              MR. HOWELL:  I received the declaration.  What do they say in the

7    declaration, your Honor?

8              THE COURT:  Shannon Watson.

9              MR. HOWELL:  Okay.  Shannon Watson does not work for Dwight

10   Manley, Inc.  She does not work for California Gold Marketing Group.  She works for

11   a real estate management company that Dwight Manley is a 50 percent owner of,

12   and they went to that office.  And they only went one time, your Honor, one time, and

13   they said that Sarah Watson, the administrative assistant, and they didn't say and so

14   replied, identified herself as VP.  Well, your Honor, an LLC doesn't have a VP; she

15   didn't identify herself as VP; she's never been VP of any of Manley's entities.

16              And, again, your Honor, there's no proof of service for the two

17   Manley entities.  And for the one proof of service for Manley individually, making one

18   effort and serving it on somebody as VP for an individual, that is a fatally deficient

19   proof of service.  And she doesn't say "I went to Mr. Manley's office three times and

20   couldn't get him and then I sub-served as appropriate."  What they say is she went

21   there one time and got the name wrong and designated this as an officer for an

22   individual, when no such thing exists.

23              Again, we've got a situation here, your Honor, where the local

24   rules require proof of service -- the federal rules require proof of service and disputed

25   motion be attached, and even though we've been meeting and conferring on this,

1    objecting on this basis, filed a detailed opposition on this basis, in each instance,

2    they still have not submitted a proof of service.  Again, that gets back to the due

3    process issue that we're dealing with here.

4              The other thing I want to talk about, your Honor, and I

5    understand that your Honor has looked at a telephone conference where the

6    California proceedings were referenced.  Your Honor, there's a discovery cutoff.  It

7    was in August, and nobody has argued that that discovery cutoff has been moved.

8    Nobody has argued that they got an order saying that you can go seek all this

9    discovery.  Nobody has briefed this issue for the judge, near as I can tell.  We're left

10   to them to say -- and they briefed this, and I actually -- and I know you reacted to it

11   differently than I did, but they briefed it that it's been implicitly authorized.  I don't

12   remember the last time I filed papers with a federal court saying another federal

13   judge implicitly authorized this.

14             We have been having this dispute with them since January.

15   They have been in front of this judge countless number of times.  It is real easy to

16   bring a motion seeking relief from a discovery cutoff.

17             THE COURT:  Well, they characterize these, really, as trial subpoenas,

18   and that's what that December motion is captioned.

19             MR. HOWELL:  Your Honor, if you look at what the cases say on trial

20   subpoenas, and we cited the law on this, your Honor, and I mean, especially in the

21   Ninth Circuit.  And the Ninth Circuit follows the majority, and quotes that we have in

22   our papers at opposition page 13 -- this is a quote from the MedImmune case --

23   "MedImmune first contends that because Genzyme subpoena is directed to a

24   nonparty, the request for discovery is not subject to the January 29th, 2010 discovery

25   cutoff and may be sought at any time before trial.  Courts are split on this issue.

1    Nevertheless, this court, a Ninth Circuit court, finds that the better view espoused by

2    a majority of the jurisdiction, is that with certain exceptions not present here, Federal

3    Rule of Civil Procedure 45 subpoenas constitute pretrial discovery that must be

4    served in the specified discovery period."

5                         And, your Honor, they only site one case that they say supports

6    them, and that case is four square opposite of what they wanted to say.  It is the

7    Insight case, and we quote it at length on page 14 of the Manley oppositions.  "The

8    primary issue before the Court is whether the plaintiff's non party subpoena duces

9    tecum constitutes pretrial discovery.  If so, plaintiff's motion attempt to conduct

10   additional discovery sought after the December 30, 2005 discovery cutoff and should

11   not be permitted."

12              THE COURT:  Apparently, Judge Sargus has been lenient with that

13   cutoff date in other situations.

14              MR. HOWELL:  your Honor, we shouldn't be left to saying "apparently"

15   and "implicitly."  They've had six months now since this dispute has been framed,

16   and they haven't gone to Judge Sargus to get an order.

17              THE COURT:  And I'm critical of that.  I am critical of that.  Especially

18   knowing they were facing fierce opposition they should have gone to Judge Sargus

19   and clarified.

20              MR. HOWELL:  And, your Honor, in terms of what Judge Sargus might

21   clarify back there if they actually went to him to get the order that they say they

22   implicitly have, Judge Sargus might say this massive amount of discovery that you're

23   seeking from these parties has nothing to do with the claims that remain in my case

24   because I have entered summary judgment against you on you tort theory, on your

25   breach of fiduciary duty theory.  You don't get to come in here and claim that you're

1   entitled to all of the net recovery that Columbus parties never received because they

2   entered into a multimillion dollar amendment liquidating that right.

3            THE COURT:  Maybe the defendants are just happy to have the

4   plaintiffs spend all this money and then are going to ambush them and say it's all

5   irrelevant.  But so far they've been silent, and one can read that a number of ways.

6            MR. HOWELL:  Here's what I -- whether they're silent or not has nothing

7   to do with my client's due process and right to protect themselves from these

8   frivolous subpoenas, which aren't even subpoenas, and are fatally deficient from a

9   procedural standpoint in terms of service, in terms of the discovery cutoff, in terms of

10   over breadth.

11            I mean, your Honor, whether the defendants care about this or

12   not, what I am told -- I ask myself why are they asking us for all of this stuff claiming

13   that they don't have unredacted copies of agreements that we entered into with

14   Columbus a decade ago?  You know what I'm told?  They have never served

15   production requests on the Columbus parties.  Your Honor, this case is six years old.

16   They admit throughout their papers that they served nearly identical subpoenas on

17   us back in 2006.  And they admit that that case, the garnishment action where -- I

18   won't characterize their behavior on that case, but it was very difficult to take --

19   they've known about these identical issues because they served these identical

20   subpoenas six years ago, your Honor.

21            And now they're coming in after their discovery cutoff with no

22   explanation, no explanation of diligence, no explanation of why they're delayed.

23   They waited five years to come back the second time on this, your Honor.  And then

24   when they came back after five years, they still waited five months to bring this

25   motion, right up until to their earlier June 2011 trial date.  This had to be brought ex

1   parte.  And one of the things that's handicapping us and I'm sure it's handicapping

2   the Court is they've never given us a joint statement saying we want this request, this

3   request, this issue.

4                    It just hasn't happened because these folks have just sat on their

5   hands.  Not for six months since we objected back in January, your Honor, because

6   they sat on their hands during that period of time.  They have sat on their hands for

7   five years.  And they have ignored their discovery cutoff and they're coming in here

8   willy-nilly, without proper service, without following any of the rules, arguing that

9   things were implicitly authorized by a judge.  Your Honor, the whole thing smells.

10  You cannot grant the issuance of these subpoenas and the enforcement of these

11  subpoenas on these facts.

12                    Maybe they need to go back to Ohio and talk to Judge Sargus

13  about what is and is not fair game, and Judge Sargus can enter into an order.  One

14  that deals with relevance issues, one that deals with timing issues.  But the notion

15  that these are trial subpoenas, your Honor, I said at the outset, trial subpoenas are

16  when you know a specific document that there's an authentication issue about that

17  document, and you say I want the contract dated August 13, 2001 because we need

18  it for authentication purposes.  Trial subpoenas require enormous specificity.  We

19  have garden variety discovery requests.  Any and all that relate to the treasure.  Any

20  and all documents relating to your communications with third parties.

21                    We've cited, and in fact they've cited, Ninth Circuit case after

22  Ninth Circuit case that says those are not trial subpoenas.  Those are discovery

23  subpoenas.  You don't get to label them as trial subpoenas and then come in and

24  say we're enforcing them post-cutoff according to Rule 45.  Courts only let you do

25  that -- and the courts use this language, your Honor -- under exceptional

1    circumstances.  These folks have sat on their hands and failed to correct their

2    problems and failed to do what they're supposed to do every step of the way in this

3    process, whether it's not following through with this back in 2006, whether it's not

4    propounding production requests on the defendants in this case at any time in the

5    past five years, whether it's waiting another five years to bring these subpoenas five

6    months after the discovery cutoff, not getting relief from the trial court to do that.  And

7    you get express relief when you do that.  Your Honor, they've had six months now to

8    go to the Ohio court and say, hey, they're objecting on the basis of the discovery

9    cutoff.

10                   Your Honor, they've had six months to fix the service problems

11   here.  They don't even attach proof of services for two of the defendants.  They don't

12   designate topics for examination.  Your Honor, they have butchered this every

13   conceivable way.  And the only way to handle this motion, your Honor, is to deny it

14   across the board and tell them to go get their ducks in a row.  Go get their order from

15   Ohio, go get whatever relevancy ruling you need from your Ohio court or the

16   exception from the still pending discovery cutoff back there, and then you come out

17   here and properly serve subpoenas and we'll talk about enforcement, and you

18   probably won't even have a problem if they do all that.

19                   But here, your Honor, we've got this shotgun approach where

20   they're trying to get every conceivable record under the sun and they've got no right

21   to it and it is sensitive, private financial information.  They need to be send back to

22   Ohio to do this the right way, your Honor.  This is a fundamental denial of due

23   process for all of my clients if these subpoenas are enforced on this record.

24                   THE COURT:  Thank you, very much.  So I want to hear about

25   relevance. I want to hear about the absence of topics in the 30(b)(6) subpoenas and I

1    want to hear about service, and then whatever else you want to mention.

2            MR. FREVOLA:  Your Honor, should I sit as well?

3            THE COURT:  Sure.  Yeah.

4            MR. FREVOLA:  I'm going to start, your Honor, with one of the last

5    statements that Mr. Howell said, and he said if they go back and get their ducks in a

6    row, we probably won't have a problem with any of this if we do it that way.  In the

7    hallway of the other courtroom here in Los Angeles in 2006, once we entered into the

8    stipulation ending the maritime attachment proceeding, I said I'm going to have to

9    ask you to document this sometime in the future, and he said oh, come out and work

10   with us.  This is their definition of working with us.

11            There is no question whatsoever, your Honor, that with regards

12   to any document whatsoever before June 2001, the stuff is totally relevant.  It's dead

13   on, your Honor, because it deals with sales proceeds earned by the defendants that

14   were paid by California Gold Marketing Group.  That is the innermost circle in terms

15   of stuff that is central to this.  And, your Honor, they haven't produced that.

16            If they really were intending to produce stuff, they would have

17   produced the stuff that was responsive and they would have fought on the other stuff.

18   And your Honor, this is something that we've been going back and forth with these

19   guys for years.  I mean, for example, in 2006, the 2006 action, we came out here and

20   wound up attaching, a maritime attachment, of certain artifacts that were being

21   shown at the Long Beach Convention Center.  And the reason we did that was

22   because under maritime law you are allowed to attach tangible and intangible

23   property of a defendant even when there is no interest remaining in the property.  So

24   it can be a reversionary interest, it can be a future interest, it can be a continued

25   interest.

1     In our attachment action, we had been told by the defendants in

2     Ohio that the defendants had a reversionary or a contingent commission right of

3     sales of these gold things onwards.  And, in fact, your Honor, when we finally got

4     through all the seals and all the secret documents that were impossible to get

5     because of purported trade secrets and all that type of stuff, in fact, that original

6     agreement did have that contingent payment provision in it.

7     Now, what we weren't aware of when we attached the gold was

8     there was this June 2001 agreement that purportedly extinguished defendant's right

9     in that gold.  That was something no one said anything about.  In fact, the investors

10    in the very defendant's company didn't know about that, even though it was five

11    years after that contract was signed.  That's how secret it is, your Honor.  And so we

12    kept saying to Mr. Howell, show us these documents.  Show us these documents,

13    and if what you're saying is true, we'll release the property because we don't want to

14    grab anyone's property that there is no property interest in anymore in the defense.

15    And they wouldn't do it, your Honor.

16    We finally had to get in front of Magistrate Lumm, and during an

17    evidentiary hearing that lasted three days, finally, in the courthouse they produced

18    the full version of the documents that showed us some terms.  We got to see those

19    documents for about an hour or two.  But it took all of that, your Honor, just to get a

20    view of these documents.

21    Now, your Honor, I have suspicions in terms of why the fight is

22    going on here.  But one of the reasons I think a fight is going on here is that Article 5

23    of the asset purchase agreement, which is the December 1999 agreement, has a

24    provision that requires them to not give out the information to third parties.  And it

25    could very well be if we were all in a room with no cameras, no microphones, no

1    court transcriber and nothing could be repeated, they may say that these defendants

2    are lying, thieving sons of guns and that here's your information, and that they're

3    required to put this fight up.  I don't know, your Honor.

4                   But what I do know is this.  In Ohio the defendants have told a

5    federal judge that California Gold Marketing Group was supposed to give them sales

6    reports about the sale of the gold.  And so the gold was supposed to start getting

7    sold in the beginning of 2000 and was going forward.  And the general terms of the

8    agreement, which are in the Sixth Circuit Court of Appeals transcript; so I can tell

9    your Honor about it, was that once you got up to about $50 million and California

10   Gold Marketing Group had made back its initial payoff that had been paid out, the

11   parties would divide out future sales proceeds based on various reasons amongst

12   each other.

13                  Now, there is a separate parallel investors action that was going

14   on in Ohio that was sealed off from us.  We couldn't see the information, but finally in

15   January of 2011, there was an argument that was before the Sixth Circuit Court of

16   Appeals that wasn't sealed and showed us that there was information out here that

17   was necessary.  And in January of 2011 we wound up going out and getting those

18   subpoenas issued.  We asked Judge Sargus about doing it, and when we saw that

19   transcript, we realized we had to do it.   And so, out here we came.

20                  And as your Honor said, defendant's silence speaks volumes

21   about the fact that these have been authorized by the judge in Ohio.  But like I said,

22   we've raised this speaking with Judge Sargus on Thursday just so to make sure that

23   he agrees with us.

24                  THE COURT:  And what -- I know you have the transcript, but tell me

25   what he said.

1          MR. FREVOLA:  Judge Sargus?

2          THE COURT:  Yes.

3          MR. FREVOLA:  He said do defendants have a problem with this?  No,

4    your Honor.  Then go ahead and do it, go take the information.  I think Judge Sargus

5    is waiting to hear information from these California parties for years because he

6    couldn't seem to get it with respect to the investor's action.  And what he was being

7    told by the defendants in that action is that these parties would not produce sales

8    information so that the defendants could determine what their further percentage

9    payment was going to be.   And rather than suing -- in the coin industry, your Honor,

10   if these lawsuits break out, supposedly it's a huge PR problem in terms of the

11   legitimacy of the treasure.  That's what I hear.

12          So I guess defendants said if we sue these guys, then we're

13   going to create problems in terms of market value, the treasure.  And therefore they

14   made a business decision not to sue.  The issue, though, your Honor, is if it turns out

15   that what we're hearing on the media reports and what we're seeing on websites of

16   people that were partners of the California Gold Marketing Group is that the treasure

17   was worth over $100 million.  Now, if that's the case, there was an extra 50 plus

18   million that was made on top of the first 50, of which defendants were supposed to

19   get a part of.

20          Now, your Honor, whether they decided to get a part of that or

21   not is really not my concern.  What is my concern, your Honor, is that the contracts

22   we're suing under very vaguely saying "net recovery" or "recovery profits."  And both

23   maritime law and Sixth Circuit precedent and Ohio law all follow contra proforentem.

24   And these contracts were contracts that were prepared by these defendants.  And

25   we're going to argue -- and Judge Sargus has not eliminated this argument from our

1    arguments -- is that if it turns out they did something to diminish that sale value

2    because of their own prerogatives, we should be able to introduce evidence showing

3    that that sale value was higher.  And they've got that information, and they won't give

4    it to us, your Honor.  That's why we need it.  I've explained this to Mr. Howell

5    repeatedly.

6                    It doesn't have a continuing value in the sale of the treasure.  It's

7    got to do with documenting what the actual number was and comparing it to this

8    asset purchase agreement to see if the number, which right now we're seeing is

9    about 57 million, should have been more like 75 or 80 million.  And, your Honor, I'll

10   tell you why it's very likely that number does exist.   The insurers who fought with

11   Columbus-American for years when the gold came up, there was a divvying up of the

12   treasure.  92 and a half percent, approximately, to Columbus-American Discovery

13   Group and 7 and a half percent to the insurers.

14                    The insurers sold that gold at an auction, a bulk auction at

15   Sotheby's in June of 2000 for about $6 million.  And I can produce that information,

16   your Honor, if you'd like to see it.  Not today, but I can send it to you as a

17   supplemental submission if you're interested.  But anyway, you've got 7 and a half

18   percent being sold for about $6 million.  And doing the math, it comes out to about

19   $850,000 per percentage point, in terms of numbers.

20                    On June 3rd in Virginia -- and I believe the transcript is in here --

21   Mr. Kirk, who is one of the directors of Columbus Exploration, said that the Sotheby's

22   insurance sale was a bulk sale done at low prices.  In other words, the 850,000 per

23   percent, in a director of the company's opinion, was low.  Well, your Honor, if you

24   apply $850,000 to 92 and a half percent, it comes out to 80 million.  And Mr. Kirk said

25   that was low, which supports the fact that 100 million is the right number, your Honor.

1    We've done our homework here, your Honor.

2                    And, your Honor, everybody is fighting so hard to keep this

3    information secret.  Another bit of information here is that the asset purchase

4    agreement has got attachments to that agreement with regard to paying off

5    Christie's.  Mr. Howell says why didn't they go to Christie's.  Christie's knows more

6    about this.  Well, Mr. Howell does know that we went to Christie's.  We tried to get

7    information out of a New York lawsuit between Christie's and Columbus-American

8    that was filed under the caption ABC versus HIJ.  The chief judge of the Southern

9    District of New York couldn't find the case, but we found it.  We made a motion to

10   intervene to get the information, and unfortunately, Judge Shane denied that

11   application.  It's like anywhere we go, your Honor, getting this information is

12   impossible.

13                   But they've got an attachment to the asset purchase agreement

14   that they haven't shown us, which is that first contract, your Honor, which is right in

15   the central hub of relevant information.

16                   THE COURT:  Okay.  Why don't you move on to the topics or absence

17   of topics.

18                   MR. FREVOLA:  Absolutely.  Your Honor, the absence of topics, in

19   terms of there's a Schedule A that's attached that does have things talking about in

20   terms of communications regarding the sale of the treasure.  The sales of the

21   treasure.  Third party consulting agreements, and things of that nature.  If you look

22   at, for example, Frevola exhibit -- this is the earlier declaration -- Exhibit 8, I believe,

23   your Honor.

24                   THE COURT:  What page is that?  I don't have tabs.

25                   MR. FREVOLA:  May I approach, your Honor?

1          THE COURT:  Yes.

2          MR. FREVOLA:  There's an example in terms of four or five different

3   requests.  And your Honor may note, they all are quite similar.

4          THE COURT:  Why are they saying there's no topics?

5          MR. FREVOLA:  Your Honor, what we're trying to do here -- your Honor,

6   we've been dealing with people for years who have basically said "I don't have that,"

7   or "That's not responsive," or "You haven't asked the question the right way."

8   There's a great quote in the Sixth Circuit Court of Appeals transcript where Steve

9   Tigis, the counsel for the investors, says to the Sixth Circuit Court of Appeals, he

10  says, "I've learned, your Honor, especially in this case, to listen to what they say."

11          And the point here, your Honor, is that that question on that

12  same piece of information was asked four different ways regarding a very specific

13  topic:  "Were there payments made to people related to the defendants that were

14  side agreements, kick backs, commissions, consulting agreements, other

15  consideration that was paid out that wasn't under the primary agreement but was

16  paid out instead to other people related as additional compensation, which again

17  goes to the total value received for the sale of the treasure.

18          Those are very explicit.  It's a very explicit topic, but they say oh,

19  we can't tell what's going on.  But their briefing papers show they know what's going

20  on. This -- the objection started off saying relevance, confidentiality, trade secrets

21  privilege.  The reply brief evolved into technicality after technicality.  All we're trying

22  to do is find out what happened to a potentially $100 million sale because our clients

23  need that information to make their damages claim in Ohio.  And Judge Sargus has

24  made clear in his June 3rd order that the amount for damages is going to be a

25  central issue for trial and he's pushed back the trial to allow us to get this information.

1          THE COURT:  Tell me about the proofs of service, or absence thereof.

2          MR. FREVOLA:  I'm going to let my partner Vito Costanzo handle that

3   because he and the Los Angeles office is doing that.

4          THE COURT:  Okay.

5          MR. COSTANZO:  Thank you, your Honor.  Your Honor, with regard to

6   service, there's two issues.  There's the entities and the individual.  With regard to

7   the entities, process server Mr. Sandoval walks in and says he has three subpoenas

8   and names the companies.  He asks Ms. Watson if she's authorized to accept

9   service, and she says yes.  He asks her for her position and she says VP.  What he

10   sees, what the process server sees when he walks in is a person who appears to be

11   in a position of authority in the company and a person who appears to know what to

12   do with the subpoenas.  That's what he sees and that's what he's told.

13          Now, counsel said that Ms. Watson was not a VP, didn't hold any

14   positions with any of the companies.  The process server doesn't know that.  All he

15   knows is what he is told.  And what he is told is reflected in his declaration.  And what

16   he is told under the cases, like NGV Gaming and Direct Mail cited in our brief, is

17   sufficient for him to believe that the person he gave the subpoenas to knows what to

18   do with them and is given a person of sufficient authority.  And under California law

19   under civil procedure code 416, it's sufficient to serve a VP.

20          And he was right, because the person that got the subpoenas --

21   and yes, he made a mistake in her name, but that happens.  That doesn't mean he

22   didn't serve the subpoenas.  That person, Ms. Watson, did know what to do with the

23   subpoenas, as evidenced by the fact that we're here today, getting all of these

24   objections, getting all kinds of questions and all kinds of various grounds.  She gave

25   it to the right person.

1          Now, with regard to the individual, Mr. Manley, there is no doubt

2    whatsoever that Mr. Manley received that subpoena, again, as evidenced by these

3    vigorous objections and the fight that we've had ever since he received it.  Again, he

4    gave it to a person who knew what to do with the subpoena.

5          THE COURT:  And who was that?

6          MR. COSTANZO:  Ms. Watson.

7          THE COURT:  It was Ms. Watson.

8          MR. COSTANZO:  Yes.  In fact she told him that Mr. Manley, that it was

9    his office and that he was out.   Now they say, well, it was a different company; she

10   works for another company.  The fact is he works there, in that office, and he was

11   out.  The Heilman case cited by the respondents for the proposition that personal

12   service must occur is based on the Gillam case, which in Gillam the Court was

13   concerned with whether or not the failure to appear for a deposition was sufficient

14   cause to strike an answer, and the Court said that the fact the subpoena was not

15   personally served means that we are not going to use that failure to appear to strike

16   the answer.

17          We cited another case, <u>Kane versus Crown Plastering</u>, which

18   talks about the important question is whether actual receipt of the subpoena is

19   accomplished and says that under Rule 45, service should be made in a manner that

20   reasonably ensures actual receipt.  That happened here.  There's no doubt that that

21   happened.  Actual receipt occurred.  No one filed a motion to quash.  And we're here

22   today because of it.

23          MR. FREVOLA:  Your Honor, if I may, just a couple of items before we

24   finish up on our side.  In terms of Monaco, also, if your Honor has seen there's an

25   Exhibit 11 of my June 11th declaration.

1          THE COURT:  Paragraph 11 or Exhibit 11?

2          MR. FREVOLA:  Exhibit 11.

3          THE COURT:  Okay.

4          MR. FREVOLA:  In April, your Honor, I told them in terms of Monaco, I

5    was willing to go much, much more circumscribed with Monaco and willing to keep

6    Monaco out of this fight because Monaco was less central.  I think that with regard to

7    Mr. Manley, the California Gold Marketing Group, and Dwight Manley, Inc., and Mr.

8    Manley himself there is evidence there was some movement of these gold pieces

9    between his companies.  And your Honor, for example, if California Gold Marketing

10   Group sold Dwight Manley, Inc. or Mr. Manley gold at a very low price, for example,

11   that would drive down the sales value again, your Honor.  And so we'd want to know

12   about that to argue issues.  But that was in April, your Honor.

13         THE COURT:  This answers another question.  There is an attorney's

14   eyes only provision in the Ohio protective order.

15         MR. FREVOLA:  And we said in the protective order, your Honor.  We

16   said, listen, if you're concerned about confidentiality, there's one in place in Ohio and

17   you know something, if the judge in Ohio gets it wrong, you can go right to the Sixth

18   Circuit Court of Appeals who tells the trial judge you can't use it.  If they were out

19   here, we'd have this bifurcated issue which creates more confusion.

20         THE COURT:  Well, if I go with my tentative, I would just make the order

21   subject to the Ohio order.

22         MR. FREVOLA:  Your Honor, in terms of Monaco, though, I also went to

23   Mr. Howell and I discussed Monaco a few weeks ago.  And during that discussion he

24   proposed what if I get a witness statement from Monaco with regards to how much

25   they paid California Gold for the stuff that they bought.  And I said so long as the

1    defendants in Ohio consent to the admissibility of that document, obviously, I need to

2    put it in a trial, I'm good with that.  All I want Monaco's information is to verify what

3    California Gold is telling us is sales.  And that gives us some verifiability.  All right?

4    Mr. Howell to me a few weeks ago, quote, if you're not going to agree on everybody,

5    then we're going to war on all of them.

6             Now, on Thursday he sent me an email and he backed off of

7    that.  He said, hey, I haven't heard back from you on Monaco.  And now he's starting

8    to talk to me about the idea of a Monaco statement, and I'm willing to talk, your

9    Honor.  I'm a reasonable person.  We're not getting anything, your Honor.  And that's

10   the problem.  We're not getting anything.

11             MR. HOWELL:  Thank you, your Honor.  First of all, with respect to

12   Monaco, they're not even mentioned or discussed in their reply papers and there is

13   no basis for any order being issued against Monaco.  They are a whole other layer

14   removed from this net profit category that they're talking about, and it is really

15   frivolous for them to have served anything on Monaco.

16             Now, the Court asked them to deal with three issues, I think that

17   you asked them to focus on.  First of all, with service.  Your Honor, we objected from

18   minute one on service in detail.  And they didn't say anything about service in their

19   moving papers.  We opposed just like we did in our objections back in January that

20   basis of service was improper and not effective.  And we only get a reply declaration,

21   which is entirely new matter, and it's improper and it's directly contradicted by Ms.

22   Watson's declaration that we submitted with our opposition.

23             THE COURT:  What does that say?  I missed that.

24             MR. HOWELL:  She says they came and they showed up and they said,

25   "Is Mr. Manley here?"  And she told them, "He's not here right now, but he'll be back."

1    And they left it with her.  She declared I've never been a VP, I don't work for either of

2    these entities and I didn't anybody that I'm authorized to do this.  And, your Honor,

3    we objected on this from minute one.  And the proof is in the pudding, your Honor,

4    that they don't want to talk about it.  They haven't to this minute submitted a proof of

5    service for California Gold or for Dwight Manley, Inc.

6                    The only proof of service that is before this court right now is for

7    Dwight Manley the individual, and she's supposedly Dwight Manley, the individual's,

8    VP, which makes no sense whatsoever.

9                    THE COURT:  I want a proof of service file.

10                   MR. COSTANZO:  I believe that's explained in Mr. Frevola's declaration

11   where it talks about how the proofs of service couldn't be located at the time the

12   motion was filed.  If the Court will recall, the motion was filed on an ex parte basis,

13   and so following the breakdown or being advised that nothing would be produced.

14   So that's why.

15                   MR. HOWELL:  Your Honor, we should not be having this discussion

16   about service because it's very easy in California to serve an entity.  You must have

17   a designated agent for service of process.  They admit they really made no attempt

18   to do that.   They don't even have a proof of service indicating they made any

19   attempt to serve either of the Manley entities.  We've been telling them about this

20   fundamental problem in their motion for six months, your Honor.  They still haven't

21   made an attempt to serve the proper parties.

22                   I want to point out something else.  The Court seems to be

23   drawing some suggestion that the defendants haven't done anything.  When I look at

24   the proof of services for the papers in this case, I don't see the defendants getting

25   notice.  They may have talked to them about it.  I don't know.  And that's part of the

1    problem that we're dealing with here, your Honor.  Is that I've been around this more

2    than the Court, and he starts talking about the Southern District of New York and

3    Virginia and Ohio.  I have no idea what he's talking about either.  I know you don't.

4    And so we're left here to kind of believe these kind of rants about we've had this

5    problem and stonewalled here, but it was denied.

6              And your Honor, we have some real clean objective factors here

7    that should absolutely govern in this dispute, and they are the normal rules of

8    engagement regarding service, discovery cutoffs.  Things that are -- relevance.  He's

9    making these relevance arguments -- you know what I got from his discussion about

10   relevance?  Is that we knew about all of this stuff back in 2006.

11             Mr. Howell supposedly -- again, this is more hearsay -- promised

12   to work with me five years ago.  And I finally got around, five years later, to bringing

13   this hopelessly late motion, and I'm asking to be given an excuse for not having done

14   this five years earlier, having not gone to Ohio to get relief from the Ohio court, which

15   without having to any of this, without having, from what I can see, serve the Ohio

16   defendants, who I knew in passing a decade ago.  I have idea what's going into their

17   thought process.

18             You also asked them about 30(b)(6) topics, your Honor.  They

19   didn't designate 30(b)(6) topics.

20             THE COURT:  You saw that list.  What is that?

21             MR. HOWELL:  That's their request for documents.

22             MR. FREVOLA:  That's the subpoena, your Honor.

23             MR. HOWELL:  Your Honor --

24             MR. FREVOLA:  It's very specific with regards to what we're looking for.

25   And your Honor, I'll also say something else.  In terms of this issue of with regards to

1    talking about they don't know the defendants.  In 2006 they got the general counsel

2    for Columbus-American Discovery Group to show up here to testify on their behalf

3    with regard to the attachment proceeding.  It's not some sort of like, you know, we've

4    never seen them before.  On top of that, your Honor, there's an indemnification

5    agreement in their agreement with the defendants where probably every dollar

6    they're spending here is going to be repaid by the defendants for putting this fight out

7    there.  It's in the agreement.

8            MR. HOWELL:  I'm going to file a motion to strike.  I've been listening to

9    "probably" and -- it's not before the Court and it's false.

10           MR. FREVOLA:  Look at the agreement.  Look at the agreement.  It's

11   got an indemnification agreement in it, Rich.  It's in an exhibit here.

12           MR. HOWELL:  Do you have any evidence to support that anybody is

13   paying one nickel of the fees other than my clients?

14           MR. FREVOLA:  No.  But Mr. --

15           THE COURT:  Address me, please.  Mr. Roble did show up here, who is

16   the general counsel of the companies when this blew up in 2006, your Honor.  Now,

17   one other thing in terms of waiting and waiting and waiting.  What I find to be

18   amusing, your Honor, is one of their objections that they raised in January is that we

19   didn't get the information from the defendants.  So your Honor, what I'm saying here

20   is they raised the objection that we weren't trying hard enough inside and then we're

21   at a point where we're close to trial, and we've seen stuff both during the hearings

22   and the Sixth Circuit transcript which shows there's information out there, but we

23   can't get it or it doesn't exist.  We then go out to them, and they say also well, you

24   should have gotten it from some other people.  So how is it that we had gotten here

25   earlier they wouldn't have said the same thing which is, oh, you should have gotten it

1    from the defendants.  They're raising every single procedural objection they can

2    when the only thing we're looking for is what the Ohio court said go get.

3              MR. HOWELL:  Your Honor, I'd like to continue the argument -- they

4    don't designate topics for examination.  They give us a set of document production.

5    Any and all documents that relate to communications with anybody relative to the

6    treasure.

7              THE COURT:  Well, that's -- did you -- are we all looking at the same

8    document?  That looks like a traditional list of topics for 30(b)(6).

9              MR. FREVOLA:  And also specificity, your Honor.  There was one that

10   lists six separate documents we want, which are contracts.  So your Honor, they can

11   say --

12             THE COURT:  I think unless there's something new someone has to

13   say, I think I've heard enough.

14             MR. HOWELL:  I do want to say one thing, your Honor.  And that is that

15   back in 2006, we got them saying this blew up and we knew about all this in 2006,

16   which was five years before or four and a half years before their discovery cutoff in

17   this case.  And they had all this in 2006, and then they waited another five years.

18   They haven't disputed the facts, they haven't even asked the defendants to produce

19   these documents.  But they do acknowledge, your Honor, that they got these

20   documents back in 2006, the underlying purchase agreement, the amendment

21   thereto.  They've had it for five years.

22                    And the reality is, your Honor, I don't know what they're doing

23   now seeking documents when they know the amendment cut off any continuing profit

24   interest.  And it was a derivative profit interest, your Honor.  I know he likes to say 50

25   million and 100 million.  They had a small continuing interest in our subsequent sales

1    over $50 million.  But they agreed to accept a multimillion dollar lump sum payment

2    in exchange for making that contingent interest go away because they didn't want to

3    wait for our sales over the next number of years.  That's what happened in June of

4    2001, and they've known about that because they admit they got those documents

5    back in 2006.

6              And what they haven't told you what happened in 2006, your

7    Honor, that case was dismissed without a nickel being paid, and the only thing they

8    got out of that was an agreement not to pursue Rule 11 sanctions.  That is the only

9    consideration that was paid in that case.  Not one penny.  Because what they did

10   back then -- and I said I didn't want to characterize it -- was frivolous and the only

11   thing they got out of that was an agreement for us not pursue Rule 11 sanctions for

12   their frivolous behavior, because that's what it was.

13             They've blown through every procedural stop sign here, your

14   Honor, and the thing to do now is they need to go get their ducks in a row in Ohio,

15   and if the Ohio court wants to direct this court to say this is relevant and the parties in

16   Ohio saying no, it's not relevant.  Because I presume they would actually be served

17   with those papers, because nothing in the proof of service here indicates they've

18   been served with these.  I told you I sent them the reply papers because I thought

19   they were so outrageous and over the top in terms of all the nonsense.  And I go,

20   what's going on with this stuff?

21             Now, I didn't get a response to it, but that's the situation we find

22   ourselves in.  They have blown through every procedural, substantive and relevant

23   stop sign here.  We cannot do this willy-nilly.  You've heard about proceedings in

24   multiple jurisdictions here, and we know they've sat on their hands for five or six

25   years on this.  They should go back to Ohio, get whatever relief they can from the

1    Ohio court.  Maybe they can go ex parte in Ohio.  I don't know.

2                        And then they can come and they can serve subpoenas on

3    actual designated agents for the entities.  Not at some administrative assistant sitting

4    at a different company office, under the designation Manley Properties, falsely

5    identifying her by name and by title, and then having no proofs of service attached.

6    Your Honor, this isn't due process.  This isn't the way this needs to work.  There's a

7    right way for them to do it.  They need to go do it.  And if they need to get further

8    extension on their trial date, if you look at the record, there's interlocutory appeals

9    happening in Ohio right now.  They may not try that case for a long time.  I don't

10   know.

11                       But the foundational point here is to get relief from the discovery

12   cutoff.  I suspect that, like most trial judges, the judge will, if it's appropriate, provide

13   measured relief, not these broad categories of any and all documents.  This is after

14   the fact discovery.  It can't be characterized as anything else.  Six year delayed

15   discovery.   Get their ducks in a row in Ohio and we'll address this again, and we

16   may even resolve it.

17                       His talk about what happened with Monaco is comically false.  I

18   told him if we can get Monaco out of this -- Monaco is happy to tell you what it paid

19   Manley.  It's got no relevancy to your case, but they're happy to tell you that.  He

20   wrote me on Friday and said I'll talk to you after the hearing about it.

21             MR. FREVOLA:  Separate conversation, your Honor.  The first

22   conversation was if you don't do one, we're all going.

23             MR. HOWELL:  I'm talking about the germane conversation.

24             THE COURT:  All right.  Anything further from plaintiff?

25             MR. FREVOLA:  No, your Honor.  It's a shame, but I have to get

1    everything right.  I just have a couple things to say on my side and I'm done, your

2    Honor.  The documents they produced in Los Angeles back in 2006, which they

3    make a big deal of, your Honor, they were redacted copies.  We still don't have full

4    copies of those documents.  And even more importantly in some respects, your

5    Honor, there were appendices to those, there were exhibits to those documents.

6    They never were produced.  And they've got agreements in terms of paying off all

7    these different obligations, which showed the payment of the amounts.  We have

8    nothing to put in the trial court to prove what consideration was received.

9               Now, Mr. Howell makes it sound like they produced all that stuff.

10   They produced the redacted documents that you have there your Honor you've seen

11   that have no sales terms whatsoever.  That's what we have a trial exhibits, your

12   Honor.  I just want to make sure that your Honor didn't think they had produced full

13   copies of documents.

14          MR. HOWELL:  We produced full copies back then.  He asked to see

15   them for an hour.  He got them for an hour.  Unredacted.  He acknowledged that

16   earlier, and he's now done nothing in the five or six years since to get unredacted

17   copies, including production requests on the Columbus defendants in Ohio because

18   they never requested documents on them.  The Columbus parties are parties to

19   these two documents that he says he got in redacted form.  Yes, we redacted out the

20   financial terms, your Honor, because we regarded that as privileged and confidential.

21   That's all that was redacted.

22               He knows the numbers because he spent an hour with the

23   documents in the courthouse in LA five years ago.  He knows what we paid.

24          MR. FREVOLA:  Your Honor, going on -- that was five years ago.

25          MR. HOWELL:  Then he does nothing and comes in here after

1     discovery cutoff and says oh, gee, I wish I'd done this six years earlier.  I wish I'd

2     asked the Columbus parties for these documents, but I didn't.  But now I'm going to

3     blow through every stop sign, discover cutoff, every rule of evidence, every element

4     of due process, and I'm going to say I want every communication you had with

5     anybody over a ten-year period about this treasure.  Even though I never served you

6     with this stuff.

7              MR. FREVOLA:  You've also seen, your Honor, the fact there are

8     transcripts with Columbus-American specifically says they don't have documents and

9     they can't produce them.  So again, we could have propounded a discovery request.

10    They already told a federal judge they don't have them, your Honor.  I mean, we

11    don't have an obligation to pursue fruitless directions of discovery when they've

12    already represented to a court they don't have this stuff.

13             MR. HOWELL:  Think about that.  They had propounded no discovery

14    requests on the Columbus defendants in this case after five years, and now because

15    somebody told them we don't have them, your Honor, that is absurd.

16             MR. FREVOLA:  Somebody told a federal judge, your Honor.

17             MR. HOWELL:  If that's the level --

18             THE COURT:  Okay.  All right.

19             MR. HOWELL:  That's what we're dealing with here, that level of

20    absurdity.

21             MR. FREVOLA:  Your Honor, if you want a proof of service, by the way.

22             THE COURT:  Yes, I do.

23             MR. FREVOLA:  Regards to what we served on defendants.  I can do

24    proof of service.

25             THE COURT:  No, no.  I want proof of service on the entities.

1        MR. FREVOLA:  Exactly.  I can file one, your Honor.

2        THE COURT:  Not on the defendants, the entities.  The subpoenas.

3        MR. FREVOLA:  We'll get those.  Those as well, your Honor.

4        THE COURT:  I take your word that you served the defendants.  You're

5    an officer of the court.  I would like to see the proof of service on the entities and do I

6    have the Manley -- Mr. Manley's individual proof of service?

7        MR. HOWELL:  Under the designation Shannon Watson, VP.  They

8    made no effort to serve Mr. Manley personally.

9        THE COURT:  All right.  Here's your exhibit.

10       MR. HOWELL:  And, your Honor, one final point.  If the standard was

11   actual receipt which counsel tried to argue, every motion to quash and every

12   opposition to a motion like this would be denied because the standard is not actual

13   receipt.  That's ridiculous.  It's proper service.  And we don't have that here.

14       MR. COSTANZO:  Your Honor, may I just make a comment on service.

15   My colleague didn't get a chance to speak uninterrupted.  The argument that entities

16   were not served presumes that it is the process server who is lying.  That is not a

17   fact.  And it's not true.  Ms. Watson disputes what happened.  The process server

18   filed a declaration and he said what happened.  But it has not been determined that it

19   was the process server who is lying instead of Ms. Watson who is lying.

20       MR. HOWELL:  The problem is we didn't get the process server's

21   declaration until reply, even though we've been objecting on this identical basis for

22   six months.  If they thought they had an issue with service, which we told them point

23   blank that they did.  No proofs of service, nothing from the process server.  We told

24   them all along that this service is defective.   And Shannon -- Sherry Watson, VP,

25   that it's not right.  That's not how you go about serving entities.  It isn't how you go

1    about personally servicing an individual for deposition.  And they acknowledge, she's

2    not a VP.

3              In California you designate who your officers are and your

4    principals of the corporation.  It's really easy.  Go on the Secretary of State site and

5    see who it is and who it is not.  She's none of those things, she's never been any of

6    those things and she didn't tell a process server she was one of those things.  And,

7    again, we got that on reply.  The declaration we got was six months after service.

8    Six months after they knew this issue was rife.

9              MR. COSTANZO:  Your Honor, again, not to rehash.  That's rehash.

10   Okay.  The process server knows what he is told.  He keeps saying she's not a VP,

11   she doesn't work there.   She didn't him that.  She told him she was a VP and he

12   served her.   That is what --

13             THE COURT:  I don't have her declaration.  I missed that.  But she says

14   I didn't make that representation.

15             MR. COSTANZO:  I understand.  None of us were there.  We don't

16   know what happened.  What we do know is what she declares under penalty of

17   perjury and what Mr. Sandoval declares.  We would need an evidentiary hearing to

18   find out which one is lying, or which one doesn't recall correctly.  Counsel speaks as

19   if that's already occurred.  What we know is what the process server was told.

20             MR. HOWELL:  We got that on reply, your Honor, that it was litigation

21   afterthought of the worst form.

22             MR. COSTANZO:  It was in reply to --

23             THE COURT:  I'm not with a number -- what?

24             MR. COSTANZO:  It was in reply to the opposition.

25             THE COURT:  I'm not happy with a number of procedural things in this

1   case.  Starting with the fact that there isn't an explicit order from the Ohio court and

2   the absence of a joint stipulation and some of the issues that you've raised, but I

3   have what I have, and I will try to have a ruling by the end of the week.  Can you get

4   me the proof of service tomorrow?

5          MR. COSTANZO:  Yes.

6          THE COURT:  All right.  Thank you.

7          MR. HOWELL:  And your Honor, if the court does not have Ms.

8   Watson's declaration --

9          THE COURT:  I probably do.  I may have just missed it.

10          MR. HOWELL:  If for some reason you have trouble finding it, I can

11   provide the Court --

12          THE COURT:  Well, where is it?

13          MR. HOWELL:  It was filed as part of the opposition.  It's a standalone

14   declaration.  I can give you my copy right now if you'd like it, your Honor.

15          THE COURT:  Maybe I don't have it.  It's a standalone?

16          MR. HOWELL:  Yeah.

17          THE COURT:  I don't know that I received it.

18          MR. HOWELL:  It has no exhibit, but I'm happy to provide the Court my

19   copy of it.

20          THE COURT:  Okay.

21          MR. HOWELL:  Do you have Mr. Manley's declaration?  He filed a

22   standalone declaration as well.

23          THE COURT:  All I have is your opposition.

24          MR. HOWELL:  Your Honor, if I may, I'll give you a copy of both Mr.

25   Manley's declaration -- do you have -- we have a number of declarations we

1    submitted as part of our papers.

2              MR. FREVOLA:  There's like four small ones, three or four pages.

3              THE COURT:  I don't have them.

4              MR. HOWELL:  Well, I will provide the Court, if I may, my copies of

5    them.  I can easily replace them.  Do you have Mr. Walker's --

6              THE COURT:  We have them on the computer; so we'll print them out.

7              MR. HOWELL:  You do have all the declarations.

8              THE COURT:  If I got courtesy copies, they got lost in the shuffle

9    because I don't have them.

10             MR. HOWELL:  Okay.  You don't need my copies, your Honor?

11             THE COURT:  If you don't mind, I'll take them.  Do you have extra

12   copies?

13             MR. HOWELL:  Yes.

14             THE COURT:  Okay.

15             MR. HOWELL:  I might do a little stapling.  That might help you.

16             THE COURT:  All right.  Thank you all.

17                  (Proceedings adjourned at 11:14 a.m.)

18

19

20

21

22

23

24

25

1

2                                 TRANSCRIBER'S CERTIFICATE

3

4

5

6               I, Nancy Staack, court approved transcriber, certify that the foregoing is

7       a correct transcript from the official electronic sound recording of the proceedings in

8       the above-entitled matter.

9               I further attest that I am not a relative or employee to any attorney or

10      party nor financially interested in this action.

11              I declare under penalty of perjury under the laws of the State of

12      California that the foregoing is true and correct.

13

14

15                                    /S/  Nancy Staack

16                              _____

17                                    Nancy Staack

18      Date:   July 13, 2011

19

20

21

22

23

24

25